# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Narvel Lassiter, | § | |
| Plaintiff, | § | |
| | § | CASE NO. 5:21-cv-1136 |
| | § | |
| v. | § | |
| | § | |
| Equifax Information Services, LLC; | § | |
| Citibank, National Association; Barclays | § | |
| Bank Delaware; and DOES 1 through 100 | § | |
| inclusive, | § | |
| | § | |
| | § | |
| Defendants. | § | |

COMES NOW Plaintiff **NARVEL LASSITER** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1.      This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2.      Defendant Citibank, National Association ("CitiBank") is reporting an unauthorized account on Plaintiff's Equifax Information Services, LLC ("Equifax") report which includes multiple, derogatory notations. This account is detrimental to Plaintiff's credit score and his ability to obtain new credit, and Plaintiff is neither an obligor nor authorized user on the account.

3.      Defendant Barclays Bank Delaware ("Barclays") is not reporting the Plaintiff's account accurately as satisfied, as it was settled or paid in full for less than full amount.

4.      The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

5.      Creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting debt information. Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

6.      This was not the intent of Congress when it enacted the Fair Credit Reporting Act.

## JURISDICTION & VENUE

7.      Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

8.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

9.      This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

10.     Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

11.     Plaintiff alleges that he was added as an authorized user to the CitiBank account and is not personally liable for the debt. Plaintiff alleges he revoked his authorized user status on the account; however, CitiBank is still reporting it on his Equifax report as if he is still an authorized user.

12.     Plaintiff alleges the CitiBank tradeline contains derogatory reporting which is lowering his credit score and his ability to obtain new credit.

13.     Plaintiff alleges the maker of the account filed Chapter 7 bankruptcy and the account was included and discharged.

14.     Plaintiff alleges that the Barclays account was settled, legally paid in full for less than the full amount, and fully satisfied in or about October of 2019, and thus is not currently past due. Despite the fact the account was satisfied, Barclays is reporting the account as "At least 120 days or more than four payments past due" which is patently incorrect and misleading.

15.     Plaintiff alleges that it is patently incorrect and misleading for a debt which was satisfied to be reported on a credit report with a current payment status of past due as this reporting makes it appear as if the debt is still owed and collectible.

16.     In the alternative, if any amount did remain after the payment and satisfaction, which Plaintiff alleges there was no such remaining amount, then that amount would have been included and discharged in Plaintiff's subsequent Chapter 7 bankruptcy filed on December 29, 2020, and discharged on April 9, 2021.

17.     Plaintiff alleges that each and every Defendant is familiar with FCRA requirements and subscribes thereto.

18.     Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

19.     Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair his FICO Score.

20.     In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

21.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     FICO, Inc.**

22.     FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

23.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions. [1]

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See* https://www.myfico.com (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score".

24.     A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

25.     Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

26.     Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

27.     There are twenty-eight (28) FICO Scores that are commonly used by lenders.

28.     A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

29.     The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

30.     FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

31.     There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

32.     Each of the five (5) factors is weighted differently by FICO.

33.     In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

34.     Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

35.     In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

36.     Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

37.     FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

38.     A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

39.     Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.     Metro 2**

40.     The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection services industries.

41.     The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by CDIA to universally report debts in a particular manner.

42.     The CDIA's Metro 2 format is the credit reporting industry standard for credit reporting. While CDIA's Metro 2 format is intended to standardize credit reporting, this standard is still subject to the FCRA's requirement of *maximum possible accuracy and completeness.*

43.     The credit reporting industry at large depends upon the Metro 2 format and the CDIA's recommendations for reporting debt.

44.     The CDIA is experienced in credit reporting. In support of this allegation, Plaintiff avers the following:

a.     The CDIA offers a FCRA certificate program for all CRAs.

b.     The CDIA offers a FCRA awareness program for all CRAs.

c.     The CDIA offers a FCRA certificate program for DFs.

d.     The CDIA offers a FCRA awareness program for DFs.

e.     The CDIA offers a Metro 2 learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 format as well as the relationship between multiple fields.

f.     The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.

g.     The CDIA developed a credit reporting resource guide for reporting credit.

45.     The CDIA's Metro 2 format is accepted by all CRAs.

46.     The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide ("CRRG").

47.     The CRRG outlines the industry standards for reporting debts using Metro 2 format.

48.     The CRRG is not readily available to the public. It can be purchased for $229.45.

49.     Even if a buyer is ready, willing, and able to pay for the CRRG, the CDIA will not grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

50.     When FICO calculates credit scores, the algorithms use Metro 2 information based on industry standards established by the CDIA.

51.     The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

52.     If the Metro 2 data received by FICO deviates from the FCRA requirements or industry standards, an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk resulting in less favorable lending terms.

### C.   e-OSCAR

53.   e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

54.   When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

55.   The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

56.   When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

57.   When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

58.   For clarification, an AUD, or other regular transmission, is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

### D.   Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail

59.   On April 13, 2021, Plaintiff ordered a three-bureau credit report from Experian to ensure proper reporting by Plaintiff's creditors (the "April 13 Credit Reports").

60.   Plaintiff noticed adverse tradelines in his April 13 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

61.   Plaintiff then disputed the inaccurate tradelines regarding the CitiBank and Barclays accounts via certified mail to Equifax on or about May 4, 2021 (the "Dispute Letter").

62.   Plaintiff's Dispute Letter specifically put CitiBank on notice that his authorized user status was revoked and that the reporting of the account should be removed.

63.   Plaintiff requested that the CitiBank account be deleted from his credit report as he had revoked his authorized user status.

64.     Plaintiff's Dispute Letter specifically put Barclays on notice that the account was closed with a zero balance, and should not be listed as past due. It also informed Barclays that if any amount was outstanding, it was discharged in Plaintiff's bankruptcy.

65.     Plaintiff's Dispute Letter also detailed what was perceived to be problematic about the accounts, addressing each tradeline individually.

66.     Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

67.     Plaintiff is informed and believes that Equifax received Plaintiff's Dispute Letter and, in response, sent Plaintiff's dispute to CitiBank and Barclays, as the data furnishers, via an ACDV through e-OSCAR.

68.     On June 14, 2021, Plaintiff ordered a second three-bureau credit report from Experian to determine if his accounts were updated.

a.     **Inaccuracy – Citibank**

69.     Despite actual knowledge, CitiBank continued, without authorization, to report another consumer's account, beginning in 512106XXXXXXXXXX, to Equifax as if Plaintiff was an authorized user. This account has a current payment status of "Charge-off", and eight derogatory late or charge off payments in the payment history.

70.     Reporting an authorized user account after the authorized user designation has been revoked is patently incorrect. Further, as this tradeline is replete with derogatory information, the fact that it is showing on Plaintiff's credit report is lowering his Credit Score, and it is misleading to an extent to adversely affect credit decisions.

71.     CitiBank did not update the reporting to delete the unauthorized account.

72.     Equifax provided notice to CitiBank that Plaintiff was disputing the inaccurate and misleading information, but CitiBank failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

73.     The most basic investigation would include a simple review of internal documentation on the account (i.e., the fact Plaintiff was merely an authorized user and had revoked such status) compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

74.     Plaintiff alleges that CitiBank did not review if its reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or its own internal records concerning Plaintiff's responsibility on the account.

75.     If CitiBank reviewed such standards, or its own internal records regarding Plaintiff's responsibility on the account, CitiBank would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

76.     By continuing to report the account to Equifax as described in paragraph 69, it incorrectly appears to third parties viewing Plaintiff's credit report that Plaintiff is an authorized user on the account, which in inaccurate. Further, as this severely derogatory account is being used to calculate Plaintiff's Credit Score, the Credit Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

77.     The lack of investigation and reporting of inaccurate and incomplete information by CitiBank is unreasonable.

**b.      Inaccuracy – Barclays**

78.     Despite actual knowledge, Barclays continued to report Plaintiff's account, beginning in 367002X, to Equifax with a current payment status tradeline of "At least 120 days or more than four payments past due". This tradeline is patently inaccurate as the account was satisfied on or about October of 2019.

79.     Plaintiff alleges that Barclays did not investigate whether Plaintiff previously satisfied the account.

80.     Barclays did not update the tradeline to reflect that Plaintiff satisfied the account, and that it was not currently past due.

81.     Equifax provided notice to Barclays that Plaintiff was disputing the inaccurate and misleading information, but Barclays failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

82.     The most basic investigation would include a simple review of internal documentation on the account (i.e., payments, including final payment and satisfaction) compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA regarding how to report a debt legally paid in full.

83.     Plaintiff alleges that Barclays did not review if its reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or its own internal records concerning Plaintiff's account.

84.     If Barclays reviewed such standards, or its own internal records regarding Plaintiff's account, Barclays would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

85.     By continuing to report Plaintiff's account to Equifax as described in paragraph 78, it incorrectly appears to third parties viewing Plaintiff's credit report that Plaintiff is currently behind on his payments, which in inaccurate. Past due debts are far more injurious to a credit score than a debt paid in full. Further, as this inaccurate reporting is being used to calculate Plaintiff's Credit Score, the Credit Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

86.     As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment status and payment history reported by Barclays on the account is lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

87.     In the alternative, if any amount remained after the payment and satisfaction in October of 2019, said amount would have been discharged in Plaintiff's Chapter 7 bankruptcy in that the debt occurred pre-petition (opened August 24, 2006) and was subject to the discharge entered on April 9, 2021. Therefore, even in this alternative scenario, Barclays should have known, the account was not past due. In this event, Barclays should have updated the CII to Metro 2 Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy and removed the past due payment status.

88.     The lack of investigation and reporting of inaccurate and incomplete information by Barclays is unreasonable.

**Damages**

89.     Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

90.     As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as

to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

91.     Plaintiff has been denied credit and is unable to rebuild his credit based on the inaccurate reporting by CitiBank. Further, Plaintiff's low credit score, resulting from CitiBank's inaccurate reporting, has caused him to abandon his intentions to apply for certain credit.

92.     Plaintiff has been denied credit and is unable to rebuild his credit based on the inaccurate reporting by Barclays. Further, Plaintiff's low credit score, resulting from Barclays' inaccurate reporting, has caused him to abandon his intentions to apply for certain credit

93.     CitiBank and Barclays' actions, as alleged herein, are each in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

## FIRST CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))

### (Against Defendants and Does 1-100)

94.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     Equifax Failed to Assure Credit Reporting Accuracy**

95.     Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

96.     Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported the CitiBank account or Barclays account as described herein.

97.     Equifax knew, or should have known, that (1) Plaintiff revoked his authorized user status on the CitiBank account, (2) the tradeline was derogatory and detrimental to Plaintiff's Credit Score, and (3) as Plaintiff was not responsible on the account and had revoked his authorized user status, the account should not be showing on his credit report. Further, Equifax knew, or should have known, that continuing to report the account does not reflect maximum possible accuracy and completeness as required by the FCRA.

98.     Equifax knew, or should have known, (1) that the Barclays account was fully satisfied, and (2) that the account should not have been reported with a current payment status tradeline of "At least 120 days or more than four payments past due" as the debt was fully satisfied.

Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

99.     As a result of Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

**B.     Willful Violations**

100.     Equifax's violations, as described herein, were willful; specifically, Equifax has intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

101.     Equifax regularly, as a policy, ignores disputes by consumers and fails to perform even a basic investigation regarding the disputes. Additionally, Equifax regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

102.     To the extent Equifax does send consumer disputes, it sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

103.     Equifax's employees receive little to no training concerning how to accurately report consumer debt.

104.     Instead, Equifax's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

105.     Equifax's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

106.     Equifax has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

107.     As a result of Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

108.     Equifax's violations were willful, rendering it liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

109.    In the alternative, Equifax was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

110.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))

### (Against Defendants and Does 1-100)

111.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    CitiBank Failed to Reinvestigate Following Plaintiff's Dispute**

112.    Pursuant to 15 U.S.C. §§ 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

113.    CitiBank sent monthly AUDs, or other monthly transmissions, to Equifax reporting late payments on the account from February 2019 through July of 2019, and charge offs from August 2019 to September of 2019.

114.    Eventually, the late payments resulted in CitiBank sending an AUD or monthly transmission to Equifax reporting the account with a charged-off payment status.

115.    After receiving the Plaintiff's Dispute Letter, CitiBank did not delete the unauthorized tradeline on the Equifax report. Instead, despite having knowledge of Plaintiff's revocation, CitiBank verified and re-reported the tradeline to Equifax via ACDV as if Plaintiff was still an authorized user.

116.    CitiBank violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation at all or by failing to conduct a reasonable investigation, and under either event, re-reporting misleading and inaccurate account information.

117.    Equifax provided notice to CitiBank that Plaintiff was disputing the inaccurate and misleading information; however, CitiBank failed to conduct a reasonable investigation as required by the FCRA.

118.    Based on Plaintiff's dispute, CitiBank should have known the account was not authorized and should have ceased its inaccurate reporting.

119.    It is undisputable that the CitiBank account in question contains multiple derogatory items and that Plaintiff was merely an authorized user on the account. Reporting an account on a consumer's report as an authorized user when they have revoked their right to be one is patently incorrect.

120.    In addition, this inaccurate reporting also adversely affects credit decisions. Derogatory marks like late payments and charge off payment status goes into calculating a Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported Credit Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, CitiBank's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and his ability to rebuild his credit score and obtain new credit.

121.    The lack of investigation by CitiBank, as required by the FCRA, is unreasonable.

**B.    Barclays Failed to Reinvestigate Following Plaintiff's Dispute**

122.    Pursuant to 15 U.S.C. §§ 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

123.    Barclays sent an AUD or other monthly transmission to Equifax reporting Plaintiff's account as currently past due. After Plaintiff satisfied the account in full in or about October of 2019, Barclays sent an AUD or other monthly transmission to Equifax reporting the payment status at that point in time (i.e., post satisfaction) as "At least 120 days or more than four payments past due".

124.    After receiving the Dispute Letter, Barclays did not correct the payment status, but instead verified and re-reported the current payment status as "At least 120 days or more than four payments past due" via ACDV to Equifax.

125.    The payment status reported in an AUD, monthly transmission, or ACDV represents the status of the account at the time of sending the AUD, monthly transmission, or ACDV, and is not a historical contractual item (i.e., monthly payment, highest balance, payment

history, etc.). Therefore, even in the event the account was previously past due, if at all, it has no bearing on its *current* pay status after the account was fully satisfied.

126.    Barclays violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

127.    Equifax provided notice to Barclays that Plaintiff was disputing the inaccurate and misleading information; however, Barclays either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

128.    Based on Plaintiff's disputes, and review of its internal records on the account, Barclays should have known its account was fully satisfied and ceased its inaccurate reporting.

129.    In the alternative, if any amount remained after the payment and satisfaction in October of 2019, said amount would have been discharged in Plaintiff's subsequent Chapter 7 bankruptcy. Therefore, even in this alternative scenario, Barclays should have known, the account was not past due, and should have updated the CII to Metro 2 Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy.

130.    Reporting a fully satisfied and/or paid debt as currently past due is patently incorrect. In addition, this inaccurate reporting also adversely affects credit decisions. Payment history (including payment status), at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a FICO score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported Credit Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Barclays' reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and his ability to rebuild his credit score and obtain new credit.

**C.    Willful Violations**

131.    Plaintiff alleges that CitiBank and Barclays have reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

132.    Plaintiff further alleges that CitiBank and Barclays have not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, have developed reckless policies and procedures.

133.    Plaintiff alleges that rather than train its employees on accurate credit reporting, FCRA requirements, and industry standards, CitiBank's and Barclays' respective employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

134.    In the alternative, CitiBank and Barclays were each negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

**D.      Equifax Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

135.    Pursuant to 15 U.S.C. 1681i(a)(1), Equifax was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's disputes regarding the CitiBank and Barclays accounts.

136.    Thus, Equifax failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

137.    Equifax is not a passive entity bound to report whatever information a data furnisher provides.

138.    Plaintiff alleges Equifax is readily familiar with FCRA requirements and credit reporting industry standards.

139.    Based on the foregoing, Plaintiff alleges that Equifax can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

140.    Equifax can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

141.    Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that CitiBank was not reporting its account at issue correctly.

142.    Had Equifax conducted a proper investigation, it could have suppressed the CitiBank debt from reporting on Plaintiff's credit report. However, Equifax continued to report the account as described herein.

143.    Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that Barclays was not reporting its account at issue correctly.

144.    Had Equifax conducted a proper investigation, it could have closed or bookended the Barclays debt by adding a notation on the credit report to show that the debt was in fact fully satisfied and not past due. However, Equifax continued to report the account as described herein.

145.   In the alternative, Plaintiff alleges that Equifax did not send an ACDV to CitiBank or Barlcays to confirm accurate reporting on its respective accounts. Despite receiving the Dispute Letter providing notice of the inaccuracies, Equifax did not delete or correct the tradelines or conduct an investigation.

146.   Equifax, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

## THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendants and Does 1-100)

147.   Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.   Equifax Failed to Review and Consider all Relevant Information**

148.   Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

149.   Equifax's violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.   Willful Violations**

150.   Equifax's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

151.   In the alternative, Equifax was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

152.   Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

### (Against Defendants and Does 1-100)

153.   Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.**     **Equifax Failed to Delete Disputed and Inaccurate Information**

154.    Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

155.    Equifax's violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.**     **Willful Violations**

156.    Equifax's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

157.    In the alternative, Equifax was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

158.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**PRAYER FOR RELIEF**

159.    WHEREFORE, Plaintiff prays for judgment as follows:

    a.  For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

    b.  Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

    c.  Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

    d.  Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

    e.  For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

    f.  For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: November 17, 2021

_/s/ Kyle Schumacher_
Kyle Schumacher
Attorney for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury.


                                                    **SCHUMACHER LANE PLLC**

Dated: November 17, 2021                    */s/ Kyle Schumacher*
                                                    Kyle Schumacher
                                                    Attorney for Plaintiff